1  LAW OFFICES OF ROBERT F. KNOX
   ROBERT F. KNOX (SBN 71524)
   REED E. HARVEY (SBN 161318)
2  319 Miller Avenue, Suite 1
   Mill Valley, CA 94941
3  Telephone: (415) 388-9090
   Facsimile: (415) 388-9590
4

   Attorneys for Plaintiff
5  CHERINGAL ASSOCIATES, INC.,
   doing business as Control Group
6

7

8                  **UNITED STATES DISTRICT COURT**

9        **NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION**

10

11 CHERINGAL ASSOCIATES, INC., a New      Case No.: 14    0189
   Jersey Corporation doing business as Control
12 Group,                                  COMPLAINT FOR INTENTIONAL
                                           MISREPRESENTATION, NEGLIGENT
13              Plaintiff,                  MISREPRESENTATION, RESCISSION
                                           AND, BREACH OF CONTRACT
14     v.

15 ELECTRONICS FOR IMAGING, INC., a
   Delaware Corporation, doing business as EFI,
16
                Defendant.
17

18
       Plaintiff alleges as follows:
19

20                        **PARTIES**

21     1.     Plaintiff Cheringal Associates, Inc., doing business as Control Group ("Plaintiff")

22 is, and at all times herein mentioned was, a corporation, organized and existing under the laws of

23 the State of New Jersey with its principal place of business in New Jersey.

24
       2.     Defendant Electronics For Imaging, Inc., doing business as EFI ("Defendant" or
25
26 "EFI") is, and at all times herein mentioned was, a corporation, organized and existing under the

27 laws of the State of Delaware, with its principal place of business in California.

28

                              **COMPLAINT**

3. Defendant's action and conduct that form the basis of this action took place in New Jersey and Illinois.

## JURISDICTION AND VENUE

4. This Court has jurisdiction under 28 U.S.C. § 1332 in that this is a civil action between citizens of different states in which the matter in controversy exceeds, exclusive of interest and costs, the sum of seventy-five thousand dollars ($75,000.00).

5. Venue is proper in this district in that Defendant is subject to personal jurisdiction in this district at the time the action is commenced, and has its principal place of business located within this district, in Alameda County.

## ALLEGATIONS COMMON TO ALL CAUSES OF ACTION

6. Plaintiff is an award-winning, full service, printed packaging provider for the pharmaceutical, consumer healthcare, nutraceutical, cosmetic and personal care industries and is located in Norwood, New Jersey.

7. Defendant is, *inter alia*, a seller and distributer of commercial printing equipment, worldwide. Among other commercial printing equipment that Defendant sells and distributes is the "Jetrion" line of printers. The Jetrion printers are represented by Defendant to be reliable, high-speed, low-production-cost, digital label and flexible packaging printers.

8. Starting in March 2012, James Imburgia, Plaintiff's Vice President of Operations investigated purchasing a new high-volume, low production cost, 13 inch, digital printer with two Flexo stations for printing labels and flexible packaging. Mr. Imburgia spoke with several different manufacturers, including Defendant. In particular, starting in April 2012 and continuing through the purchase of the subject printer from Defendant, Mr. Imburgia spoke with John Hickey, a sales representative for EFI and with Jason Oliver, who was Defendant's global

sales director, about EFI's Jetrion digital printers. Mr. Imburgia discussed several issues relating to the Jetrion printers with Hickey and, in particular, asked him about the reliability and durability of the digital print heads, because he knew that this was an important issue with such digital printers. For example, there are 25 print heads on the Jetrion 4900ML 13" print station (15 print heads on the 8.3" printer) and Plaintiff knew that replacements of such print heads would be costly in the material cost of each print head, in the labor costs for installation of those print heads, and in the lost production time of the printer while the heads were being replaced. The material cost alone of a single print head for the Jetrion printer purchased by Plaintiff is approximately $5,500. Mr. Hickey told Mr. Imburgia in one of their early phone conversations in April of 2012, that EFI had dozens of customers with Jetrion printers and the print heads lasted six months to a year, or even longer. Mr. Hickey told Mr. Imburgia that, so long as Plaintiff did proper maintenance on the machine, there was no reason that the print heads would not last that long on any Jetrion printer that Plaintiff purchased from EFI. However, at the time that Hickey made those statements to Imburgia, Defendant and Hickey knew that a significant number of Defendant's customers who had purchased Jetrion printers had already experienced printer head failures after much shorter periods of operation. Prior to Plaintiff's purchase of a Jetrion printer, neither Mr. Hickey nor Mr. Oliver disclosed to Mr. Imburgia, or to any other representative of Plaintiff, that a significant number of EFI customers had experienced print head failures on Jetrion printers after much shorter periods of use than the six months to a year period represented by Mr. Hickey to Mr. Imburgia.

9.    In these conversations in the spring of 2012, Mr. Imburgia specifically told Hickey that Plaintiff wanted a digital printer that also had the capability of doing "Flexo printing," and that Plaintiff would not purchase a printer if it did not have that capability. At the time,

competitors of EFI were selling printers that did both digital and Flexo printing. Mr. Imburgia told Hickey that this dual capability was an absolute, non-negotiable requirement for the printer. Hickey told Mr. Imburgia that the Jetrion 4900ML would soon have Flexo stations and that, when those stations became available, they could be added so that Flexo printing could be performed with the Jetrion 4900ML.

10. During the months after Imburgia's initial contacts with Hickey and Oliver, Plaintiff and Defendant tested Defendant's Jetrion 4900 ML printer with all of the substrates that are used by Plaintiff and confirmed that the printer worked with all of those substrates.

11. Between September 11 and 13, 2012, Jeffrey Levine and William Cheringal, Plaintiff's co-Presidents, and Mr. Imburgia attended the LabelExpo trade show in Chicago, Illinois. LabelExpo is a trade show devoted mostly to commercial label printing. At the trade show, Levine, Cheringal and Imburgia continued their conversations with Hickey and Oliver about the purchase of the Jetrion 4900ML UV digital printer. During these conversations, neither Hickey nor Oliver disclosed to Levine, Cheringal or Imburgia that a significant number of customers of EFI had experienced numerous print head failures on Jetrion digital printers after much shorter periods of use than six months. During these conversations at the trade show, Levine, Cheringal and Imburgia emphasized to Hickey and Oliver that it was absolutely essential that the printer have the capability of doing both digital and Flexo printing, that EFI's competitors had printers with that dual capability, and that Plaintiff would not purchase the printer if it did not have that capability. Hickey and Oliver reassured Levine, Cheringal and Imburgia that the Jetrion 4900ML would soon have Flexo stations and that two Flexo stations would be added to the printer in 2013 so that Flexo printing could be performed with the Jetrion 4900ML.

12. Based on the specific representations and omissions by Defendant, as alleged above, on or about September 26, 2012, Plaintiff entered into a contract (the "Contract") to purchase the Jetrion 4900ML 8.3" printer with a Flexo upgrade (the "Printer"). A true and correct copy of the Contract is attached hereto as Exhibit A. On the top of every page of the Contract, which was prepared entirely by Defendant, the following description of the machine is stated: Control Group Jetrion 4900ML+W 8.3"/330 Future Flexo Upgrade. This designation of the Printer emphasized the essential aspect of the Flexo stations. The Contract also specifically states on page 5 that it includes "the addition of two (2) Flexo Stations in 2013." The purchase price (installed) was $905,000 ("Purchase Price"). Included in the Purchase Price was an upgrade to a 13" print station (from 8.3") at the end of the first quarter or beginning of the second quarter 2013. Also included in the Purchase Price was the addition of two Flexo stations, which were to be installed in 2013. The Purchase Price was to be paid in three installments: 30% on the signing of the purchase order; 50% upon shipment/installation; and 20% 60 days after installation. Plaintiff made the first two payments to Defendant as required by the Contract, but Plaintiff has never made the final payment of 20% of the Purchase Price, because the Printer started failing less than 60 days after installation, as alleged hereinbelow. Therefore, Plaintiff has never accepted the Printer as delivered and installed by Defendant. Defendant has never demanded payment of that final 20%. On the contrary, Defendant explicitly told Plaintiff that the final payment would not be due until the cause of the Printer failures was determined and the problem was completely eliminated. As alleged hereinbelow, Defendant has never determined the cause of the Printer failures and the problem has not been eliminated.

13. The Printer was installed at Plaintiff's place of business in Norwood, New Jersey on or about November 12, 2012. Within four weeks of that installation a number of print heads

needed to be replaced. Within three months of installation of the printer, all of the print heads had to be and were replaced. In fact, only three months after the original installation, some of the print heads had been replaced twice. Each time a print head was replaced the Printer was taken out of service for two to four days.

14. In March 2013, Defendant supplied the 13" print station, which essentially meant that a whole new printer was installed by Defendant's technicians over a period of about two weeks. During the installation of the 13" print station some of the print heads failed and needed to be replaced. After installation of the 13" print station, the print heads continued to fail at alarmingly high rates which were substantially more frequent than every six months to a year, which, prior to the purchase, Defendant had represented would be the replacement rate.

15. During the entire time period that Defendant replaced print heads on the Printer, Defendant's technicians and other representatives on several occasions told that Plaintiff had done nothing wrong to cause the print head failures and that those failures were a problem with the Printer. Defendant's technicians and other representatives continually asked Plaintiff to be patient and repeatedly assured Plaintiff that Defendant was trying to determine the root cause of the print head failures, which other customers were also experiencing. Defendant told Plaintiff that Defendant was confident it would determine the root cause of the print head failures and remedy the problem. However, despite Defendant's repeated assurances, Defendant has never provided a solution to the problem of the print head failures and the Printer's resulting total failure to operate as a commercially feasible printer.

16. Plaintiff has refused and continues to refuse to accept the Printer due to its commercially unacceptable print head failure rate, which constitutes a defect that has substantially impaired the value of the Printer to Plaintiff. Accordingly, despite Defendant's

-6-
COMPLAINT

1  repeated and continuing assurances that Defendant would fix the defect, in or about August

2  2013, Plaintiff notified Defendant that it was rejecting the Printer and wanted to receive a full

3  refund. To the extent that any actions or statements by Plaintiff prior to that rejection may have

4  constituted an acceptance of the Printer, Plaintiff's notification in or about August 2013

5
6  constituted a revocation of that acceptance. Plaintiff's prior acceptance, if any, was based on

7  Defendant's repeated assurances that the failures and nonconformity of the Printer would be

8  cured, and Plaintiff's reasonable reliance on those assurances.

9      17.   Defendant's promise to deliver two Flexo Stations for the Printer in 2013 was a

10  critical and material part of the Contract. If Defendant had not promised to provide those Flexo

11
12  stations within that time frame, Plaintiff would not have purchased the Printer, because there

13  were other printers sold by different manufacturers that already had the dual capability of doing

14  both digital and Flexo printing. In breach of Defendant's promise, Defendant failed to make

15  delivery of the Flexo Stations in 2013 and Defendant now has told Plaintiff that Defendant does

16
17  not have any delivery date at this time for those stations. Defendant's failure to perform this

18  obligation under the Contract is an additional reason why Plaintiff has rejected and does reject

19  the Printer.

20      18.   As of the filing date of this Complaint, Defendant has refused to refund the money

21  that Plaintiff has paid for the Printer.

22
                              **FIRST CAUSE OF ACTION**
23                                  (Intentional Fraud)

24      19.   Plaintiff incorporates herein by this reference each and every allegation in
25
     paragraphs 1 to 18 above as though fully set forth herein.
26
27      20.   In the spring of 2012, when Defendant orally represented to Plaintiff (through its

28  sales representative) that each print head would last a minimum of six months and likely a year

or more, Defendant knew this was not true.  Defendant had already sold and installed a number of the Jetrion printers and knew that a significant number of the customers using those printers were experiencing print head failures after significantly shorter periods of use.  These print head failures were not disclosed to Plaintiff at any time prior to Plaintiff's purchase of the Printer.

21.    In the spring of 2012, when Defendant represented to Plaintiff that each print head would last a minimum of six months and likely a year or more, Defendant was aware that Plaintiff was relying on those representations in deciding to purchase the Printer.

22.    Defendant's representations to Plaintiff that each print head would last a minimum of six months and likely a year or more, and Defendant's failure to disclose the print head failures experienced by a significant number of Defendant's other customers, were material facts and omissions that were relied on by Plaintiff in deciding to purchase the Printer.  Had Defendant told Plaintiff the truth, that a significant number of Defendant's customers were experiencing print head failures on Jetrion printers after much shorter periods of time than six months, and in some cases after only a few weeks, Plaintiff would never have purchased the Printer.

23.    At the time of the purchase of the Printer, Plaintiff was unaware that Defendant's representations were untrue and that a significant number of Defendant's customers were experiencing alarmingly high print head failure rates, and Plaintiff could not have reasonably discovered these facts.

24.    Plaintiff has been damaged by its purchase of the Printer in reliance on Defendant's misrepresentations and omissions.

25.    As a direct and foreseeable consequence of Defendant's representations and omissions, Plaintiff has suffered general and consequential damages, all to be proved at trial,

exceeding $900,000, including, but not limited to, the payment of a substantial portion of the Purchase Price, interest paid on the amount financed, extra production costs, lost production time, and loss of profits.

26. Defendant acted with malice, fraud and oppression and with conscious disregard of Plaintiff's rights. Accordingly, Plaintiff is entitled to an award of punitive damages against Defendant.

WHEREFORE, Plaintiff prays for judgment as hereafter set forth.

## SECOND CAUSE OF ACTION
(Negligent Misrepresentation)

27. Plaintiff incorporates herein by this reference each and every allegation in paragraphs 1 to 26 above as though fully set forth herein.

28. In the spring of 2012, when Defendant orally represented to Plaintiff (through its sales representatives) that each print head would last a minimum of six months and likely a year, Defendant had no reasonable basis for believing that to be true.

29. In September 2012, when Defendant represented to Plaintiff that each print head would last a minimum of six months and likely a year or more, Defendant was aware that Plaintiff was relying on those representations in deciding to purchase the Printer.

30. Defendant's representation to Plaintiff that each print head would last a minimum of six months and likely a year or more was a material representation and was relied upon in Plaintiff's decision to purchase the Printer. Had Defendant not made this representation, Plaintiff would never have purchased the Printer.

31. At the time of the purchase of the Printer, Plaintiff was unaware that the actual failure rate of the print heads experienced by a significant number of Defendant's customers was

much more frequent than the rate represented by Defendant, and Plaintiff could not have reasonably discovered these facts.

32. Plaintiff has been damaged by its purchase of the Printer in reliance on Defendant's misrepresentations and omissions.

33. As a direct and foreseeable consequence of Defendant's representations and omissions, Plaintiff has suffered general and consequential damages, all to be proved at trial, and exceeding $900,000, including, but not limited to, the payment of a substantial portion of the Purchase Price, interest paid on the amount financed, extra production costs, lost production time, and loss of profits.

WHEREFORE, Plaintiff prays for judgment as hereafter set forth.

### THIRD CAUSE OF ACTION
(Rescission)

34. Plaintiff incorporates by this reference as though fully set forth herein each and every allegation in Paragraphs 1 through 33 above.

35. Plaintiff is entitled to and seeks rescission of the Contract.

36. Defendant knew or should have known that the print heads would not last a minimum of six months as Defendant represented, but rather that they would fail in a much shorter time.

37. The length of time that the print heads would last without needing replacement was material with respect to Plaintiff's purchase of the Printer, because Plaintiff knew that replacements of such heads would be costly in the material cost of each head, in the labor costs for installation, and in the lost production time of the Printer. The material cost alone for the replacement of one print head on the Printer is approximately $5,500.

1    38.   Defendant's representations regarding the length of time that a print head would last

2    were, in fact, not true, as alleged above.

3    39.   In addition, Defendant represented that it would provide two "Flexo Stations" for

4    the printer in 2013. It is now 2014 and Defendant has not provided the two Flexo Stations. In

5
6    fact, Defendant has told Plaintiff that Defendant does not presently have a delivery date for the

7    Flexo Stations, even though their delivery and installation by Defendant in 2013 was a specific,

8    absolutely essential and material performance obligation in the Contract.

9    40.   At the time of sale, Defendant either knew that it would not provide the Flexo

10   Stations to Plaintiff in 2013, or Defendant knew that it had no reasonable basis for such believing

11
12   it would do so, or Defendant was mistaken regarding its ability to provide these two Flexo

13   Stations in 2013.

14   41.   Plaintiff reasonably relied on all of Defendant's representations and omissions in

15   agreeing to the Contract and Plaintiff would not have agreed to the Contract had it not been for

16   all of those representations and omissions by Defendant.

17
18   42.   At all relevant times, Plaintiff was ignorant of the falsity of Defendant's

19   representations and did not know the facts that Defendant had failed to disclose. If Plaintiff had

20   been aware of the true facts, Plaintiff would not have entered into the Contract.

21   43.   As a result of Defendant's misrepresentations and/or mistakes of fact, as alleged

22
23   above, Plaintiff is entitled to rescind the Contract and to receive restitution from Defendant of all

24   payments made by Plaintiff to Defendant as a result of the Contract on the grounds of fraud

25   and/or mistake of fact and/or failure of consideration.

26   44.   Plaintiff has and does hereby offer to restore to the Defendant the benefits, if any,

27   including the Printer, that Plaintiff has received pursuant to Contract.

28

-11-
COMPLAINT

45. In addition to a rescission, Plaintiff seeks recovery for all consequential damages that Plaintiff has suffered as a result of Defendant's conduct, including inter alia interest paid on the Purchase Price from the close of escrow to the date of trial, taxes paid, extra production costs, lost production time, costs of repairs, and lost profits.

WHEREFORE, Plaintiff prays for judgment as set forth below.

## FOURTH CAUSE OF ACTION
(Breach of Contract)

46. Plaintiff incorporates herein by this reference each and every allegation in paragraphs 1 to 45 above as though fully set forth herein.

47. Plaintiff has performed all of the obligations for which Plaintiff's performance is required under the Contract, except for payment of the final installment payment. As alleged above, Plaintiff has refused to pay the final installment of the Purchase Price and has rejected the Printer due to the commercially unacceptable failure rate of the printer heads, which has substantially impaired the value of the Printer to Plaintiff. Defendant has agreed that the final installment payment has never been due, since Defendant has never determined the cause of the printer head failures and never fixed the problem.

48. Defendant has materially breached the Contract by delivering the Printer with the print head defects, as alleged above. Defendant also has materially breached the Contract by failing to deliver and install two Flexo Stations in 2013, as the Contract requires.

49. As a result of Defendant's material breaches of the Contract, Plaintiff has been damaged in an amount to be proved at trial, as alleged above.

WHEREFORE, Plaintiff prays for judgment as follows:

1.    On the First Cause of Action, for special, general and compensatory damages exceeding $900,000, together with prejudgment interest at the rate of 10 percent per annum and punitive damages in an amount to be determined at trial;

2.    On the Second Cause of Action, for special, general, and compensatory damages exceeding $900,000, together with prejudgment interest at the rate of 10 percent per annum;

3.    On the Third Cause of Action, for rescission of the Purchase Order and compensatory damages according to proof, together with prejudgment interest at the rate of 10 percent per annum;

4.    On the Fourth Cause of Action, for special, general and compensatory damages exceeding $900,000, together with prejudgment interest at the rate of 10 percent per annum;

5.    On all causes of action, costs of suit; and

6.    Such other and further relief as the Court deems proper.

Dated: January 13, 2014               LAW OFFICES OF ROBERT F. KNOX

By:_____
           ROBERT F. KNOX
           Attorneys for Plaintiff
           CHERINGAL ASSOCIATES, INC.,
           doing business as Control Group

# Exhibit A

Control Group 4900ML+W 8.3/330
Future Flexo Upgrade

## Proposed Solution



Jetrion 4900
5-color digital press with inline laser die cutting
(W+CMYK)

 



Jetrion 4000
4 -color press
(CMYK )



Jetrion 4830
4 or 5-color press
(CMYK or W+CMYK)

Prepared By:

John Hickey
Sales Development Manager

Control Group 4900ML+W 8.3/330
Future Flexo Upgrade

**Proposed Solution**



September 26, 2012

Control Group
James Imburgia
500 Walnut Street
Norwood, NJ 07648
USA

Dear James,

Thank you for your interest in EFI-Jetrion UV Inkjet Printers. I am pleased to offer you the following
confidential LabelExpo show pricing information for a Jetrion 4900 UV digital printer to complement and
maximize your short run efficiencies. We look forward to working closely with you and developing a mutually
beneficial relationship in the near future. Efi has secured the appropriate shipping insurance for this
equipment and has identified Control Group as beneficiary in the event of a loss during shipment between
Ypsilanti Michigan, Chicago, IL and Norwood, NJ

Once again thank you for your time and consideration. Please let me know if you have any questions
regarding this information.

Sincerely,

John Hickey
Sales Development Manager

EFI
Jetrion Industrial Inkjet Systems
Email:
Office
Mobile          +1 (401) 441-7477

Control Group 4900ML+W 8.3/330
Future Flexo Upgrade

## Proposed Solution

The Jetrion 4900 Series UV Inkjet Press offers narrow web converters an affordable alternative to flexographic and toner printing. With low running costs, the production advantages of color UV inks and the flexibility of full digital technology, the Jetrion 4900 is well-suited for narrow web applications, including labels, tags, tickets, and forms. The 4900 is available with an imaging width of up to 8.3" (210 mm) and includes a dual head laser with slitter and semi-automatic turret.

| Specifications | |
|---|---|
| Width | Imaging width up to 8.3 inches (210 mm) / web width up to 13 inches (330mm) |
| Speed | Print Speed = 60-80 fpm (19-25mpm) avgerage, (white ink, cut type & substrate dependent) |
| Print Resolution | Native 360/720 dpi mode |
| | Visual resolution greater than 1,100 dpi via grayscale technology (8 levels) |
| Print Engine | Piezoelectric Inkjet |
| Ink Type | Jetrion UV4100 |
| Number of Colors | 5 = Cyan, Magenta, Yellow, Black, White |
| Base Configuration | LED Cure (White) + UV Curable (CYMK) |
| Roll Diameter Max. | 24 inches (610 mm) |
| Converting Options | Inline dual laser, back score, matrix removal, slitter & semi-automatic turret standard |
| Substrate Options* | A large number of BOPP, PP, PET, paper, supported film, some foils and tag |
| | * Note: Not all substrates will have good print characteristics or be supported |
| Footprint | (w x d) 23.13' x 4.35' (7050mm x 1325mm) |
| Weight | 11,353.8 lbs (5,315 kg) |
| Control Panel | Monitor w/ keyboard & mouse |
| Operating System | Windows XP® |
| **Power Requirements** | |
| Printer: | 360-400VAC, 50-60 Hz, 63 Amps w/Neutral+GND ) |
| | |
| | |
| Air Consumption | 6 bar - 10 Nl/min (converting) |
| | 6 bar - 220 Nl/min (printing) |

*Note: Specifications may change without notice

## Warranty

**System Components Warranty (Excluding Printheads):**

· Twelve (12) months on all system components from date of installation

☐Additional Parts Pricing will be provided upon request

☐System or individual component abuse is not covered by warranty.

☐Abuse includes but is not limited to power fluctuations, outages or surges.

**Printhead Warranty:**

☐Three (3) months on all printheads from date of installation.

· Nine (9) months for a maximum of three (3) printheads commencing three (3) months after the date of installation.

☐Printhead abuse is not covered by warranty.

☐Abuse includes but is not limited to power fluctuations, outages or surges.

**Labor Warranty:**

☐Three (3) months from date of installation

☐For additional Service Options including emergency service and technical phone support, please contact
your sales representative

Control Group 4900ML+W 8.3/330
Future Flexo Upgrade

## Proposed Solution

| | Part Number | System Components | List Price | Qty |
|---|---|---|---|---|
| **Base System** | 45098000 | 4900 Series UV Digital Press | $875,000 | 1 |
| | 45098800 | 4900 Mistral | Included | 1 |
| | 45087664 | Application Workstation (KIT,FIERY XF,SW,JETRION PERMANENT) | Included | 1 |
| | 45056218 | ES-1000 Color Measurement Tool | Included | 1 |
| | 45089534 | 4100 UV Ink Starter Kit = 14 liters (1 * 3.5 liter bottle of each CYMK) | Included | 1 |
| | 45090011 | Jetrion UV Curable White 4000 Ink = 14 liters (4 * 3.5 liter bottles) | Included | 1 |
| | 100000002603 | Basic System installation and maintenance training including travel expenses | Included | 1 |
| | | **Total System Price** | **$875,000.00** | |

| | Part Number | System Components | List Price | Qty |
|---|---|---|---|---|
| **Optional Accessories** | 45086795 | Variable Print - Monochrome color plane (Black on white) | Included | 1 |
| | 45077085 | Back to back job queue printing software | Included | 1 |
| | TBD | Upgraded 13" chill plate | $30,000 | 1 |
| | 45101917 | Static Ionizer Bar – 120v | $1,495 | |
| | TBD | Product Detect | Included | 1 |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | **Total Optional Accessories** | **$30,000.00** | |

| | Part Number | System Components | List Price | Qty |
|---|---|---|---|---|
| **Training & Service** | TBD | Advanced Workflow, RIP & Color Management training at Customer Facility<br>*Training will be up to 5 days including travel expenses* | $7,500 | |
| | TBD | Gold Service Plan<br>*Up to 2 Days onsite and up to 4 Printhead replacements excluding abuse* | $40,000 | |
| | TBD | Platinum Service Plan<br>*Up to 6 Days onsite and unlimited Printhead replacements excluding abuse* | $60,000 | |
| | | **Total Cost of Training & Service Plans** | | |
| | | **Final Price Including Installation & Training** | **$905,000** | |

Control Group 4900ML+W 8.3/330
Future Flexo Upgrade

## Proposed Solution

*By signing below, Customer acknowledges and agrees that it has reviewed and accepted the terms and conditions of this proposal. Under no circumstances shall EFI-Jetrion's liability to customer for any claim be more than the actual price paid by Customer to EFI-Jetrion for the specific product or service for which such claim is based. EFI-Jetrion disclaims any implied warranties and shall not be liable for any special, indirect, incidental or consequential damages arising out of this proposal. All sales are final. Any special conditions or acceptance requirements must be listed below and agreed upon by EFI-Jetrion.*

| | | | |
|---|---|---|---|
| **System Price:** | **$875,000** | **Notes: Initial shipment will be a Jetrion 4900ML+W 8.3" Included in this price is an upgrade from 8.3" to 13" Print station at end of 1st Quarter or beginning 2nd Quarter value at $100,000. This agreement also includes in this price the addition of two (2) Flexo Stations in 2013 each valued at $10,000/each. Initial tier three ink pricing for first year $75/liter CMYK, $100/Liter white. Warranty is per installation date** | |
| **Final System Price** | **$875,000** | |
| Optional Accessories and Training Costs | $30,000 | |
| **Total Costs** | **$905,000** | |

| **Fluid Pricing** | **Type** | **Part Number** | **List Price per liter** | **List Price per case 4 * 3.5 Liter Bottles (14 Liters)** |
|---|---|---|---|---|
| | 4100 UV Ink: | Cyan, Magenta, Yellow, Black | $125 | $1750 |
| | 4100 UV Ink: | White Ink | $200 | $2800 |

| **Payment Terms** | | | |
|---|---|---|---|
| 30% | Due with Purchase Order | | |
| 50% | Due to ship Printer | from Graphexpo | |
| 20% | Due Net 60 days from Installation | | |

| **Tax Exempt** | **Status** | **Tax ID Number** | |
|---|---|---|---|
| | | | |

| | | **Customer** | | |
|---|---|---|---|---|
| **Freight, Insurance and Duties** | **Type** | **Collect / Direct Billed to Customer Account** | **Prepaid by EFI and Invoiced** | **EFI** |
| | Freight coordinated and paid by: | | X | |
| | Insurance coordinated and paid by: | | X | |
| | Duties  paid by: | X | | |
| | VAT paid by: | X | | |
| | Delivery for International shipments ONLY: | Door-to-Door | | |

| | | **Billing Information** | **Shipping Information** |
|---|---|---|---|
| Contact | Company | Control Group | Same as Billing |
| | Address | 500 Walnut Street | |
| | City, State Zip | Norwood, NJ 07648 | |
| | Country | USA | |
| | Contact | James Imburgia | |
| | Phone | 2015649883 | |

**Notes:**

1 System Price *does not* include shipping costs

2 *For all listed prices and fees, title and risk of loss for all products sold or licensed by EFI-Jetrion to Customer shall transfer to Customer at EFI's designated manufacturing plant(s). Unless otherwise designated in this Proposal, EFI-Jetrion shall act as agent for Customer and procure insurance against risk of loss and/or procure and prepay for the shipment on behalf of Customer for of any items purchased.*
Failure to use a properly specified UPS system based on the EFI-Jetrion Customer Readiness Document will void any and all warranties to damaged system components.

3 **Inks:** Customer acknowledges that the Equipment is designed to operate solely with EFI-Jetrion approved inks. Use of third-party, non-approved inks in the Equipment will void any and all warranties related to the Ink Delivery System, any parts and components thereof, including without limitation, the entire ink system, the solenoids, ink pumps, ink level sensors, ink reservoirs, tubing, o-rings, fittings, filters, and jets.

4 **Substrates:** Customer acknowledges that variations in print quality may be experienced due to the use of certain substrates, among other factors. Customer further acknowledges that the Equipment may not be compatible with certain substrates, and that use of these substrates may cause damage to the Equipment. EFI-Jetrion makes no representation or warranty in any manner with respect to the compatibility or the operation of the printer with any particular substrate, and shall have no liability to Customer with respect thereto.

Customer Signature: _____

Date: __9/26/12__

EFI-Jetrion Signature: _____

Date: _____

Control Group 4900ML+W 8.3/330
Future Flexo Upgrade

## Proposed Solution

**1.    Limited Warranty.**

*installation*

**a.    Warranty Coverage:** Unless otherwise provided in the Proposal, the warranty period shall be twelve (12) months ("Warranty Period"), commencing on the shipment date of the Equipment to Customer's designated location. During the Warranty Period, EFI warrants that the Equipment sold to Customer shall materially conform to the specifications set forth in the documentation provided to Customer at the time of installation ("Specifications"). During the Warranty Period, EFI's sole obligation under this warranty shall be the repair or replacement of parts or components of the Equipment that fail to materially conform to the Specifications. EFI shall have the sole discretion to determine whether the applicable parts or components fail to meet the Specifications. Customer shall pay all freight charges, duties and taxes, both for shipment of parts and components to EFI for repair or replacement, and the return shipment from EFI to Customer.

Following the expiration of the Warranty Period, EFI shall have no obligation to repair or replace **Equipment parts or components, or provide any services with respect to this warranty, unless otherwise specifically agreed to in writing by EFI. Any limitations or modifications to this must be specifically set forth in the Proposal.**

TO THE MAXIMUM EXTENT PERMITTED BY LAW, THE WARRANTY AND REMEDIES EXPRESSLY SET FORTH HERE ARE EXCLUSIVE AND ARE IN LIEU OF ALL OTHER WARRANTIES AND REMEDIES, ORAL OR WRITTEN, EXPRESS OR IMPLIED, AND CUSTOMER SPECIFICALLY DISCLAIMS ANY SUCH WARRANTIES AND REMEDIES, INCLUDING, WITHOUT LIMITATION, THE IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE OR ANY IMPLIED WARRANTIES ARISING FROM COURSE OF PERFORMANCE, COURSE OF DEALING OR USAGE OF TRADE. THERE IS NO WARRANTY OR REPRESENTATION OF NON-INFRINGEMENT, TITLE, OR THAT OPERATION OF EQUIPMENT WILL BE ERROR-FREE, UNINTERRUPTED, OR FAULT-TOLERANT.

**b.    Exceptions:** The FOREGOING limited warranty does not apply to any non-conformity from Specifications resulting from (a) natural disasters, ANY REPAIR, alteration, MODIFICATION, misuse, negligence, abuse, accident, mishandling, storage or operation in an improper environment, or (b) use, handling, storage or maintenance other than in accordance with the Specifications and EFI's applicable documentation or instructions, or (c) operation of the Equipment by someone other than a person that has been CONFIRMED by EFI as a "Certified Operator". Without limiting the generality of the foregoing, the warranty IN THIS SECTION does not apply to damage from use of non-approved inks, "expired" inks, or improperly inserted ink containers and INCOMPATIBLE substrates.

**c.    Safety Features:** There is no representation or warranty in any manner as to the safety or the operation of the Equipment, and EFI shall have no liability to Customer with respect thereto.

**d.    Warranty Service:** Customer acknowledges that EFI makes no representation or warranty (a) regarding the services to be provided by EFI, or (b) the operation or performance of the Equipment during or following the completion of any warranty services.

**2.    Limitation of Liability.**

TO THE EXTENT NOT PROHIBITED BY LAW, IN NO EVENT WILL EFI BE LIABLE FOR ANY INDIRECT, SPECIAL, INCIDENTAL OR CONSEQUENTIAL DAMAGES ARISING OUT OF CUSTOMER'S USE OF OR INABILITY TO USE THE EQUIPMENT OR ANY COMPONENT THEREOF, EVEN IF ADVISED OF THE POSSIBILITY OF SUCH DAMAGES. IN PARTICULAR, EFI IS NOT RESPONSIBLE FOR ANY COSTS, INCLUDING, BUT NOT LIMITED TO, THOSE INCURRED AS A RESULT OF LOST PROFITS OR REVENUE, LOSS OF USE OF THE EQUIPMENT, LOSS OF DATA, THE COST OF RECOVERING ANY DATA, THE COST OF SUBSTITUTE EQUIPMENT, OR CLAIMS BY THIRD PARTIES. IN NO CASE SHALL EFI'S LIABILITY EXCEED THE TOTAL AMOUNT ACTUALLY PAID BY CUSTOMER TO EFI FOR THE EQUIPMENT.

Control Group 4900ML+W 8.3/330
Future Flexo Upgrade

## Proposed Solution

**3.    Export Law Compliance**. Customer understands and hereby acknowledges that the Equipment and any software and related technology made available under this Proposal are subject to the export laws and regulations of the United States, including the U.S. Export Administration Regulations. Customer agrees to comply with all such applicable laws and regulations, and to maintain a record of exports, re-exports, and transfers of the Equipment, software and/or related technology according to United States and local laws. Customer shall take actions necessary for obtaining any applicable export licenses and exemptions.

The Equipment and any Licensed Software and related technology and other information and materials are prohibited for export or re-export to a number of countries and persons, including without limitation, Cuba, Iran, Libya, North Korea, Sudan, and Syria, and to any person or entity subject to a U.S. order denying export privileges. These orders include the U.S. Department of Commerce's Denied Parties List, Entities List, and Unverified List, the U.S. Department of Treasury's list of Specially Designated Nationals, Specially Designated Narcotics Traffickers and Specially Designated Terrorists, and the Department of State's Debarred Parties List.

**4.    Intellectual Property Rights**. The Equipment and any software and/or documentation provided with it represent and will continue to represent the valuable, confidential and proprietary property of EFI or the applicable third party licensor. EFI or the applicable third party licensor shall retain ownership of all such intellectual property rights in and relating to the Equipment (and any associated software and/or documentation) and to any derivative works there from.

**5.    General Provisions**.

**a.    Taxes:** Customer shall be solely responsible for and pay all applicable tariffs, duties and taxes, however designated or levied, based on Customer's possession or use of the Equipment or on this Proposal, including, without limitation, any sales, use, value added and personal property taxes.

**b.    Compliance With Law:** Customer shall be responsible for compliance, and shall comply, with all applicable laws and regulations, including without limitation federal, state, local and foreign laws and regulations, pertaining to its use of the Equipment and its obligations and activities under this Proposal.

**c.    Governing Law:** This Proposal shall be governed in all respects by the laws of the State of California, without regard to its conflict of laws provisions. With respect to any dispute related to this Proposal or the Equipment, each party consents to the personal jurisdiction and exclusive venue of the state and federal courts of California.

**d.    Severability; Interpretation:** In the event that any terms or condition herein is held to be illegal, invalid or unenforceable under present or future laws by any court of competent jurisdiction, then such provision will be fully severable and this Proposal will be construed and enforced as if such illegal, invalid or unenforceable provision were not a part hereof. This Proposal shall be interpreted fairly in accordance with its terms and without any strict construction in favor or against either of the parties hereto.

**e.    Entire Agreement and Modification:** This Proposal constitutes the full and complete understanding and agreement of Customer and EFI, and supersedes all prior negotiations, understandings and agreements between the parties related to the Proposal. Any waiver, modification or amendment of any provision of this Proposal will be effective only if in a writing signed by Customer and EFI.

**f.    Force Majeure:** Except for payment of monies, no party shall be liable for its failure to perform any obligations on account of strikes, shortages, failure or acts of suppliers, riots, insurrection, fires, flood, storm, explosions, acts of God, war, military operations, acts of terrorism whether actual or threatened, acts of a public enemy, epidemics, quarantines, governmental action, labor conditions, earthquakes, material shortages or any cause which is similar to those enumerated or beyond the reasonable control of such party.